# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MELVIN SMITH, | ) | |
| | ) | |
| DANIEL ASKEW, | ) | |
| | ) | |
| ANTONIO PEAD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| FRITO-LAY, INC. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Serve Registered Agent: | ) | |
| The Corporation Company, Inc. | ) | |
| 112 SW 7th St., Suite 3C | ) | |
| Topeka, Kansas 66603 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

1. COMES NOW, Plaintiffs Melvin Smith, Antonio Pead and Daniel Askew for their Complaint against Defendant, for unlawful discrimination on the basis of Plaintiff's race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq., as amended, ("Section 1981") states as follows.:

## NATURE OF THE CLAIM

2. This is an action for legal and equitable relief to address the deprivation of Plaintiffs' civil rights and retaliation pursuant to 42 U.S.C. Section 1981 et seq. (Section 1981).

## PARTIES

3. Plaintiff Melvin Smith (hereinafter, "Plaintiff Smith" or "Smith") is an African

American male, a United States citizen, and a resident of the State of Iowa.

4. Plaintiff Antonio Pead (hereinafter, "Plaintiff Pead" or "Pead") is an African American male, a United States Citizen, and a resident of the State of Kansas.

5. Plaintiff Daniel Askew (hereinafter, "Plaintiff Askew" or "Askew") is an African American male, a United States Citizen, and a resident of the State of Kansas.

6. Defendant Frito-Lay, Inc. (hereinafter "Defendant" or "Frito-Lay") is an Delaware corporation authorized to do business in the State of Kansas, and may be served by serving its registered agent, The Corporation Company, Inc., CSC-Lawyers Incorporating Service Company, 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1367.

8. The events giving rise to the claims herein occurred in Topeka, Kansas, Sedgwick County, Kansas.

9. Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

## FACTS COMMON TO ALL PLAINTIFFS

10. Throughout their employment with Defendant, Plaintiffs have been subjected to discrimination, harassment and retaliation and have worked in a hostile and racist environment.

11. Black employees are held to different standards and rules than white employees. For instance, white employees have been allowed to leave the plant after a forklift accident without submitting to the required drug test and are not terminated as policy requires. Black

8

employees are required to submit to drug tests and receive discipline.

12. Black employees are routinely disciplined for minor policy infractions while white employees are not similarly disciplined. For instance, white employees routinely have their cell phones out while at work without consequence. black employees who have their cell phones out are disciplined.

13. Racist jokes are frequently told at the plant and, despite complaints to management, the individuals who are making the jokes are not disciplined.

14. Racist comments are frequently made at the plant and, despite complaints to management, the individuals who are making the jokes are not disciplined.

15. Racist and threatening comments and actions are common occurrences at the plant. Black employees have been referred to as smelly gorillas, have been called niggers, references have been made to lynching and cotton picking.

16. These comments have been reported to management and the white employees making the comments have not been disciplined or terminated.

17. Swastikas and racist words are repeatedly drawn on walls, a swastika with the words "hail Trump" was drawn in the bathroom, and a noose was hung at the plant.  Despite cameras being placed throughout the plant, Defendant has claimed it is unable to determine the perpetrator of these actions.

18. Black employees are not given the same employment opportunities as white employees.  Despite having more tenure, white employees, even those who have been reported for making racist and harassing comments, receive promotions despite having less tenure and seniority than black employees.

19. Black employees who complain to management are retaliated against

including being falsely accused of work violations, suspended, threatened by employees, and unable to receive promotions.

20. The unlawful discrimination, harassment and retaliation has been allowed to continue without consequence to those violating the law.

## FACTS SPECIFIC TO MELVIN SMITH

8. Plaintiff Melvin Smith was hired by Defendant to work at its Topeka, Kansas location in August 2009 as a part time sanitor and after nine months transferred to the warehouse as a warehouser.

9. Throughout his employment Smith was discriminated against because of his race, harassed because of his race and retaliated against for making complaints about the unlawful actions.

10. In approximately March 2018, Smith met with Travis Deter, Craig Heiman and two representatives from Human Resources, Anthony Diers and Karen Helton, to complain about favoritism toward white employees at the plant, racism at the plant and the hostile environment that black employees were being subjected to because management allowed the unlawful behavior to continue. Smith's union steward was also present.

11. Specifically, Smith reported that a noose was hanging in the plant and that a white employee had referred to a black employee as a "nigger" and provided written evidence. The white employee was not terminated.

12. After his complaints, defendant failed to take any action to resolve the issues Smith brought to their attention.

13. In May 2018, Jesse Pilkington, a white employee, was involved in a forklift accident. Frito-Lay policy required that the warehouse lead, Randy White (white male), report

8

the accident and that Pilkington submit to a drug test. White refused to report the accident and when Smith insisted that the accident be reported per policy, White stated to Smith, "I'm not the one you want to fuck with."

14. Smith reported the accident to the warehouse manager, Cooper Lehr.

15. Pilkington left the plant without submitting to the required drug test.

16. Smith asked Lehr why Pilkington was allowed to leave the plant without submitting to a drug test and, when he did so, why he was not fired since refusing to submit to a drug test is a terminable offense at Frito-Lay. Lehr told Smith that Pilkington had decided to go home, and that Lehr was not at the plant in time to stop Pilkington from leaving and that he was investigating the accident.

17. Smith then met with Lehr and Kenneth Cole, union steward, to complain about the discrimination he experienced and witnessed at Frito-Lay. Smith complained to Lehr about that management was protecting and providing special treatment to Pilkington and other white employees and that he believed Frito-Lay was routinely engaging in racist practices and behavior. Lehr told Smith that he was not going to speak with him about the complaints he was making and that he was going to speak with Cole alone.

18. Once Smith left the meeting, Lehr called his supervisor Craig Heiman, to speak about the meeting with Smith. Lehr told Heiman that Smith had used offensive language and had raised his voice at Lehr. Heiman told Lehr that Smith should be suspended for an indefinite number of days for raising his voice and using offensive language.

19. Cole told Heiman that Smith did not raise his voice or used offensive language at any time during the meeting, but Heiman and Lehr decided that Smith would be suspended without pay.

20. Smith was suspended for three days without pay. When he returned to work, he met with Lehr, Heiman, Helton and several union stewards and was told that he had been suspended for raising his voice to Lehr, using offensive language and being aggressive toward Pilkington and following him too closely with his forklift. Heiman also told Smith that Pilkington left the plant after his accident because he was afraid of Smith and told Smith that he believed Pilkington.

21. During this meeting Heiman and Lehr also told Smith that Lehr had been afraid and felt threatened by Smith on the night of the suspension.

22. When Smith asked what he had said or done to cause Lehr to feel this way, Heiman told Smith that it did not matter whether or not he had made threatening statements or engaged in threatening behavior but that how management perceived him was all that mattered.

23. Smith then reported to Heiman that White had made a threatening statement on the night of the accident, and asked Heiman whether White would receive the discipline, prior to any investigation, as Smith had received.

24. Heiman refused to answer Smith's question and White did not receive comparable discipline for engaging in threatening behavior toward Smith.

25. During the meeting Helton also told Smith she felt threatened by Smith and accused Smith of having called her a "cunt bitch."

26. The allegations made against Smith were provably false, and Smith's account of the meeting with Lehr was supported by independent witnesses.

27. Luke Domme, union steward, requested the video footage of Smith allegedly following too closely to Pilkington and was never provided any footage.

28. Smith filed a grievance with Frito-Lay and despite his grievance going through

three levels of management. Smith's unpaid suspension was upheld.

29. After Smith complained to management about discrimination and harassment at the plant, Smith learned that a white employee threatened to lynch Smith. This comment was reported to management, but the employee was not disciplined or terminated.

30. Because Smith was repeatedly subjected to a racist and retaliatory workplace and because Frito-Lay did nothing in response to Smith's ongoing complaints about the unlawful behavior, Smith became increasingly concerned about his physical safety.

31. The conduct to which Smith was subjected was so severe, egregious and pervasive and his working conditions so intolerable that on July 26, 2018, Smith was forced to resign his employment.

## FACTS SPECIFIC TO DANIEL ASKEW

32. Askew began his employment with Frito-Lay on January 31, 2017 as a temporary loader and after three months transferred to a full-time forklift operator.

33. During his employment he was the victim of discrimination, harassment and retaliation.

34. For example, white employees asked if Askew wore camouflage so he could blend in with "us" referring to white employees. This incident was reported to management but the employees were not disciplined.

35. Sean Steele, a white employee, cursed at Askew, calling him names such as "bitch" and "pussy." When Askew reported the conduct to management, the employee was not disciplined.

36. False rumors have been started about Askew, he has been threatened by employees asking him to step outside and stared at in an intimidating manner.

37. Despite Askew's complaints, the discriminatory, harassing, intimidating and retaliatory behavior continued.

38. It is standard procedure that after any forklift accident, the employee involved in the accident must immediately submit to a drug test or be terminated. One white employee while in the plant requested other employees to provide urine for him.

39. Askew reported the incident and that the employee was requesting that others provide urine for his drug test to management. After reporting, Lehr then wrote up Askew for disrupting the investigation into the accident and fighting, quarrelling, or inciting disorder due to his complaint. At no time was Askew upset or insubordinate. Askew simply reported the incident and went back to his work.

40. When Askew complained to management about the discriminatory work environment, management and the employees Askew complained about became hostile and retaliatory.

41. For example, white employees falsely reported Askew for driving aggressively. Management called Askew into meetings regarding the reports, believing the reports made. Askew asked for proof that he was driving aggressively yet no camera footage was available to substantiate any of these complaints.

42. Askew and Vershon Moore (black male employee), received a verbal warning from Travis Deter, plant manager, and Melissa LNU, floor supervisor, because white employees complained that they looked aggressive and intimidating.

43. Askew was told he cannot be promoted to a lead position because he does not work well with other employees because of his complaints.

44. Management recommended that Askew transfer to a different shift which pays

less money as a solution to his requests for a fair working environment.

45. One of Askew's management resources, FNU Reem, came to the plant floor to coach Askew about his job performance. Askew's trainer, Judy LNU, told Reem that Askew was performing correctly. Reem refused to let Judy LNU speak, putting her hand in front of Judy's face, and continued to tell Askew that he was performing his job incorrectly. Later that night Askew was called into a meeting and formally coached for allegedly doing his job incorrectly, which was the first step of discipline.

46. Askew was subjected to an ongoing racist and unfair workplace, which was allowed to perpetuate without consequence to those employees engaging in the illegal behavior.

47. In June 2019, Deter told Askew that he needed to remove a mask he was wearing at work. Multiple employees wore masks at work without issue. Askew refused to remove the mask as he was not violating any policy and asked for a union steward when Deter threatened to suspend him for the day. The union steward told Deter that Askew could not be suspended for wearing the mask.

48. The following day Askew was again called into a meeting with Deter and told that he would be written up for engaging in any intimidating or threatening behavior. Askew had not engaged in any such actions which would have triggered any such meeting.

49. Because Defendant failed to remedy the unlawful actions at Frito-Lay, Askew felt his safety was in danger.

50. The conduct to which Askew was subjected was so severe, egregious and pervasive and his working conditions so intolerable that he was forced to resign his employment.

## FACTS SPECIFIC TO ANTONIO PEAD

51. Plaintiff Pead began his employment at Frito-Lay in July 2013 as a warehouse and forklift operator.

52. Throughout his employment Pead has been the victim of discrimination, harassment and retaliation and has worked in a hostile and racist environment.

53. Prior to his employment with Frito-Lay, Pead was employed as a warehouse plant supervisor and a plant manager at a previous employer.

54. In approximately August 2014 Pead began applying for a lead position.

55. Pead has applied eleven times for the lead position and has never been promoted despite being told by Defendant that his interviews are amazing and that he has all the necessary qualifications for the job.

56. White employees with less tenure and experience are given the lead positions over Pead.

57. In early 2020 Defendant opened an additional warehouse which houses AGV robots which opened additional lead positions.

58. Pead was not offered any of the new lead positions nor any of the positions that opened when current leads moved to the new warehouse space.

59. Jesse Pilkington was one of the employees awarded a lead position over Pead despite having less seniority and having been previously demoted for engaging in racist behavior including calling Pead a "nigger."

60. In approximately April 2020, Pead applied for an available forklift trainer position. The position was awarded to a white employee with one-year additional seniority than Pead.

61. Per company policy, the plant supervisor is supposed to meet with the unsuccessful candidates to tell them why they were not chosen for the position.

62. No one met with Pead so he asked his plant supervisor why he was not awarded the position.

63. The plant supervisor told Pead that he did not receive the position because the employee awarded the forklift trainer job had more seniority than Pead.

64. None of the positions Pead previously applied for were decided on seniority as Pead was the most senior employee for those positions.

65. Pead has been held to different standards than white employees. For example, Pead has been given a warning for infractions such as having his phone out at work while white employees engaging in the same behavior have not been warned or disciplined in any way.

66. In 2018 Pead and Mike Lintz, a white employee, volunteered to come into work early to assist with tasks. When Pead finished cleaning up his area and was ready to get his assignment, he asked Sarah LNU, the manager on the shift, for his assignment. Sarah walked away from Pead, refusing to respond to Pead's question, and instead went and told Lintz what the tasks were for Pead and Lintz.

67. Pead has complained to management about the discrimination and harassment on multiple occasions, including filing a charge of discrimination with the Equal Employment Opportunity Commission yet, after his complaints the white employees are not disciplined and no changes are made at the plant.

68. Forklift operators are given a score to achieve each day as a measure of performance. More tenured forklift operators are often given special assignments at the warehouse which would not be measured by a score.

69. As one of the most tenured warehouse employees, Pead was given special assignments to handle on a regular basis exempting him from meeting the score.

70. On March 4, 2020, two days after the EEOC visited the plant to investigate the charges of discrimination filed by Smith, Askew and Pead, Bailey LNU, Pead's plant resource, gave Pead a verbal warning for not making score despite the fact that he was performing special assignments.

71. The white employees also performing special assignments and not making score were not given verbal warnings.

72. Prior to this time, Pead had not been required to meet the score because he was performing special assignments.

73. Pead and the union representatives complained that the verbal warning was unfair and discriminatory, but Bailey told Pead she was not going to discuss it.

74. On May 13, 2020, Bailey gave Pead a written warning for not making score even though Pead was still performing special assignments. White employees performing special assignments and not making score were not given write ups or disciplined.

75. Despite Pead's ongoing complaints to management he continues to be subjected to a discriminatory, harassing and retaliatory working environment.

## COUNT I –VIOLATION OF 42 U.S.C. SECTION 1981

76. Plaintiffs incorporates by reference each and every factual allegation contained in paragraphs 1 through 75, as if more fully set out herein.

77. As described above, Defendant subjected Plaintiffs to a hostile work environment and discriminatory work environment on the basis of their race in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, et seq.

78. Defendants' conduct included, inter alia:

    a. Acting against Plaintiffs in a discriminatory manner;

    b. Failing to promote Plaintiffs;

    c. Subjecting Plaintiffs to different employment requirements than white employees;

    d. Failing to stop the unlawful treatment to which Plaintiffs were being subjected;

    e. Subjecting Plaintiffs to a harassing and hostile work environment;

79. All of the foregoing conduct was unwelcome, based on Plaintiffs' race and sufficiently severe or pervasive to alter the conditions of Plaintiffs' employment and created an abusive atmosphere.

80. Defendant deprived Plaintiffs, based on their race, of their right to make and enforce contracts on the same terms as enjoyed by white persons, in violation of 42 U.S.C. § 1981.

81. As a direct and proximate result of the violations described herein, Plaintiffs have suffered damages and continue to suffer damages in the form of lost wages and emotional distress.

82. The actions of Defendant were willful, wanton, and with malice or reckless disregard for the rights of Plaintiffs, entitling them to punitive damages.

WHEREFORE, Plaintiffs pray judgment against Defendant, for their economic, compensatory and punitive damages suffered as a result of Defendant's actions, for injunctive relief, for reasonable attorney's fees, for their costs and expenses incurred herein, and for such further relief as may be just and equitable.

## COUNT II - RETALIATION UNDER SECTION 1981

83. Plaintiffs incorporate by reference each and every factual allegation contained in paragraphs 1 through 75, as if more fully set out herein.

84. Because of their complaints Plaintiffs have suffered retaliation in the form of increased harassment, loss of promotion, lost wages and lost business opportunities.

85. Further, as described above, Defendant's actions caused Plaintiffs emotional harm in the form of humiliation and embarrassment.

86. The actions of Defendant are in violation of 42 U.S.C. §1981, in that Defendant coerced, intimidated, threatened, or interfered with Plaintiffs following their exercise of rights granted or protected by the statute.

87. As a direct and proximate result of this retaliation, Plaintiffs have suffered and continue to suffer damages in the form of lost income and emotional distress.

88. The actions of Defendant were willful, wanton, and with reckless disregard for the rights of Plaintiffs, entitling them to punitive damages.

WHEREFORE, Plaintiffs pray judgment against Defendant, for their damages suffered as a result of Defendant's actions, for injunctive relief, for reasonable attorney's fees, for their costs, interest and expenses incurred herein, and for such further relief as may be just and equitable.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## DESIGNATED PLACE OF TRIAL

Plaintiff, by and through counsel, hereby designates the United States District Court for the District of Kansas at Kansas City as the place of trial.

Respectfully submitted,

HOLMAN SCHIAVONE, LLC
By: /s/ *Tiffany B. Klosener*
Tiffany B. Klosener, MO Bar #47078
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
Email: tklosener@hslawllc.com


HKM Employment Attorneys LLP
By: /s/ John J. Ziegelmeyer , III
1501 Westport Road
Kansas City, Missouri 64111
Telephone  (816) 875-3332
jziegelmeyer@hkm.com

ATTORNEYS FOR PLAINTIFF